UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA,

                                        Plaintiff,

- against -

MICHAEL PIZZUTI, a/k/a MICHELE PIZZUTI,

                                        Defendant.
-------------------------------------------------------------x

**OPINION & ORDER
ON MOTION FOR SUMMARY
JUDGMENT**

No. 24-CV-9228 (CS)

Appearances:

Rebecca L. Salk
Assistant United States Attorney
New York, New York

Hans H. Chen
U.S. Department of Justice
Washington, D.C.
*Counsel for Plaintiff*

Michael Pizzuti
Tuckahoe, New York
*Pro Se Defendant*

Seibel, J.

Before the Court are Plaintiff's motion for summary judgment, (ECF No. 12), and

Defendant's motion to dismiss, (ECF No. 19).  For the following reasons, Defendant's motion is

DENIED, and Plaintiff's motion is GRANTED.

I.      **BACKGROUND**

        A.      **Facts**

For purposes of the motion for summary judgment, I rely on the following facts, which

are based on Plaintiff's Local Civil Rule ("LR") 56.1 Statement, (ECF No. 14 ("P's 56.1

Stmt.")), and the supporting exhibits, and are undisputed.

Defendant Michael Pizzuti was born in Italy in 1964.  (P's 56.1 Stmt. ¶ 1.)  On December 16, 1988, the Immigration and Naturalization Service ("INS") granted Defendant's application for permanent residence status based on his marriage to a U.S. citizen.  (*Id.* ¶ 25.)[1]

On December 3, 2001, a grand jury in this District returned a twelve-count indictment against Defendant and four others.  (*Id.* ¶ 2; ECF No. 1-2 (the "2001 Indictment").)  On December 5, 2001, Defendant was arrested and arraigned, and pleaded not guilty to the offenses in the indictment.  (P's 56.1 Stmt. ¶ 6.)  He was released from custody on a $350,000 bond.  (*Id.*)  On December 2, 2002, he pleaded guilty to the crimes alleged in Counts One, Four, and Nine of the indictment.  (*Id.* ¶ 7.)  Count One charged a violation of 18 U.S.C. § 371 based on a conspiracy to commit mail fraud and transport a stolen vehicle from December 1999 to February 2000.  (*Id.* ¶ 3; 2001 Indictment at 1-3.)  Count Four charged another violation of § 371 based on a conspiracy to transport, receive, possess, sell and distribute contraband cigarettes from July 1998 to August 2000.  (P's 56.1 Stmt. ¶ 4; 2001 Indictment at 5-7.)  Count Nine charged a third violation of § 371 based on a conspiracy to deal in counterfeit U.S. currency from February 2000 to May 2000.  (P's 56.1 Stmt. ¶ 5; 2001 Indictment at 9-10.)  On March 6, 2003, Defendant was sentenced principally to fifteen months' imprisonment.  (P's 56.1 Stmt. ¶ 8.)

From May 2001 to September 2001, Defendant conspired to extort money from an investment advisor who had been running a Ponzi scheme in which Defendant and others had invested.  (*Id.* ¶ 11.)  In that connection, on July 9 and 10, 2001, Defendant and others attempted to extort money from that advisor through the wrongful use of force or threatened force, and on the latter date Defendant and others persuaded a co-conspirator to delete computer files from the

---

[1] INS was dissolved in 2003 and its functions are now performed by U.S. Citizenship and Immigration Services, which is part of the Department of Homeland Security.  *See Khanom v. Kerry*, 37 F. Supp. 3d 567, 571 n.1 (E.D.N.Y. 2014)*.*

advisor's computer to prevent law enforcement from recovering them. (*Id.* ¶¶ 12-13.) As a result, on March 9, 2005, Defendant was named in four counts of a seventeen-count indictment returned by a grand jury in the Southern District of New York. (*Id.* ¶¶ 14-18; ECF No. 1-5 (the "2005 Indictment").) On July 12, 2005, a jury found Defendant guilty on all four counts. (P's 56.1 Stmt. ¶ 19.) Count Two charged conspiracy to commit extortion from May 2001 to September 2001 in violation of 18 U.S.C. § 1951. (*Id.* ¶ 15; 2005 Indictment at 2-3.) Count Five charged attempted extortion from July 9, 2001 to July 10, 2001 in violation of 18 U.S.C. §§ 1951 and 2. (P's 56.1 Stmt. ¶ 16; 2005 Indictment at 4-5.) Count Six charged Defendant with using and carrying a firearm during and in relation to a crime of violence (the offense in Count Five) on July 9-10, 2001, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 924(c)(1)(B)(i). (P's 56.1 Stmt. ¶ 17; 2005 Indictment at 5-6.) Count Ten charged obstruction of justice on July 10, 2001 in violation of 18 U.S.C. §§ 1512(b)(2) and 2. (P's 56.1 Stmt. ¶ 18; 2005 Indictment at 8-9.)

On June 14, 2006, Defendant was sentenced principally to 219 months' imprisonment. (P's 56.1 Stmt. ¶ 20.) The Second Circuit affirmed the convictions on April 22, 2008. (*Id.* ¶ 21.) On October 23, 2019, the district court vacated Defendant's conviction on Count Six based on the Supreme Court's decision in *United States v. Davis*, 588 U.S. 445 (2019), (*id.* ¶ 22), and on October 28, 2019 resentenced Defendant for his remaining convictions to 210 months' imprisonment, (*id.* ¶ 23). The Second Circuit affirmed that sentence on February 11, 2021. (*Id.* ¶ 24.)

Meanwhile, on May 4, 2001, Defendant had filed with the INS a Form N-400 Application for Naturalization. (*Id.* ¶ 26; *see* ECF No. 1-8 ("N-400 Application").) Although he was married to a U.S. citizen, he elected to seek naturalization as an individual who had been a permanent resident for five years. (P's 56.1 Stmt. ¶ 26.) On the application, Defendant checked

"no" in response to the question whether he had ever "knowingly committed any crime for which [he had] not been arrested." (*Id.* ¶ 27.) He did the same in response to the question whether he had ever been "arrested, cited, charged, indicted, convicted, fined or imprisoned for breaking or violating any law or ordinance excluding traffic regulations." (*Id.* ¶ 28.) Defendant signed his N-400 on April 19, 2001, certifying under penalty of perjury that the application was true and correct. (*Id.* ¶ 29.)

On May 2, 2002, an immigration officer interviewed Defendant regarding his N-400 to determine his eligibility for naturalization. (*Id.* ¶ 30.) At the beginning of the interview, the immigration officer placed Defendant under oath. (*Id.* ¶ 31.) The officer asked Defendant whether he had ever knowingly committed any crime for which he had not been arrested, and Defendant responded that he had not. (*Id.* ¶¶ 32-33.) The officer also asked Defendant whether he had ever been arrested, cited, charged, indicted, convicted, fined or imprisoned for breaking or violating any law or ordinance excluding traffic regulations, and Defendant responded that he had not. (*Id.* ¶¶ 34-35.) At the conclusion of the interview, Defendant signed his N-400 in the presence of the officer, certifying under penalty of perjury that the contents of the application were true to the best of his knowledge and belief. (*Id.* ¶ 36.)

Based on Defendant's representations on his N-400 and in his interview, INS approved Defendant's application for naturalization, and he was naturalized on July 24, 2002. (*Id.* ¶¶ 37, 40.) Had Defendant stated that he had committed a crime for which he had not been arrested, or that he had been arrested, cited, charged, indicted, convicted, fined, or imprisoned for breaking or violating any law or ordinance excluding traffic regulations, INS would not have approved his N-400 and would have either denied the application or paused its adjudication to conduct further

4

investigation, in conformance with naturalization laws and regulations, policy and training. (*Id.* ¶¶ 38-39.)

### B.      **Procedural History**

On December 3, 2024, the Government filed its Complaint against Defendant, seeking to cancel Defendant's Certificate of Naturalization and revoke his citizenship pursuant to 8 U.S.C. § 1451. (ECF No. 1.) The Government made four attempts to personally serve Defendant with the Summons and Complaint at his last known address between December 10, 2024 and February 12, 2025, but was unable to do so. (*See* ECF No. 8 ("Aff. of Service"); P's 56.1 Stmt. ¶¶ 43-44.) On February 12, 2025, the Government's process server affixed a copy of the Summons and Complaint to the door of Defendant's residence and the next day mailed a copy of those documents to Defendant at the same address. (*See* Aff. of Service.)

On September 26, 2025, the Government filed a pre-motion letter in anticipation of its motion for summary judgment. (ECF No. 9.) The Court waived the pre-motion conference requirement that same day, and directed the Government to file its motion, (ECF No. 10), which it did on October 27, 2025, (ECF No. 12). On November 26, 2025, Defendant appeared for the first time and filed a motion to dismiss the complaint under Federal Rule of Civil Procedure ("FRCP") 12(b)(5). (ECF No. 19.) The Court entered a briefing schedule on December 16, 2025, (*see* ECF No. 22), and the motion was fully submitted on January 7, 2026.

## II.      **LEGAL STANDARDS**

### A.      **12(b)(5) Motion to Dismiss**

Pursuant to Federal Rule of Civil Procedure 12(b)(5), a defendant may move to dismiss a case for "insufficient service of process." Fed. R. Civ. P. 12(b)(5). "When a defendant raises a Rule 12(b)(5) challenge to the sufficiency of service of process, the plaintiff bears the burden of

proving its adequacy." *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003).[2]  A motion to dismiss under this rule "is jurisdictional because a federal court . . . may only exercise personal jurisdiction over a defendant, if the plaintiff's service of process upon the defendant was procedurally proper." *Welsh v. United Parcels Serv., Inc.*, No. 24-CV-3876, 2025 WL 754039, at *2 (E.D.N.Y. Mar. 10, 2025).  "When considering a motion to dismiss pursuant to 12(b)(5) for insufficient service of process, courts must look to matters outside the complaint to determine whether it has jurisdiction." *Caruso Glynn, LLC v. Sai Tr.*, No. 11-CV-4360, 2012 WL 4053802, at *3 (S.D.N.Y. July 9, 2012).

**B.       Motion for Summary Judgment**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) ("When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor.").  "Assessments of credibility and choices between

---

[2] Unless otherwise indicated, all case quotations omit internal citations, quotation marks, alterations and footnotes.  The Court will send Defendant copies of any unreported decisions cited in this Opinion and Order.

6

conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996).

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). "If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials –

including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

*Pro se* litigants, however, must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).  Nonetheless, "[a] *pro se* party's bald assertion, unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Walker v. Vaughan*, 216 F. Supp. 2d 290, 296-97 (S.D.N.Y. 2002).  Even where a *pro se* non-moving party fails to meaningfully respond to the movant's summary judgment motion,

> courts may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial, and in doing so, may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement.  Thus, the Court may grant an unopposed motion for summary judgment against a *pro se* plaintiff if:  (1) the *pro se* plaintiff has received adequate notice that failure to file a proper opposition may result in dismissal of the case; and (2) the facts as to which there is no genuine dispute show that the moving party is entitled to a judgment as a matter of law.

*Murray v. Dabo*, No. 22-CV-4026, 2024 WL 1421119, at *4 (S.D.N.Y. Feb. 2, 2024), *report and recommendation adopted*, 2024 WL 964599 (S.D.N.Y. Mar. 5, 2024).  "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented."  *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

8

## III.   DISCUSSION

### A.   Defendant's Motion to Dismiss Under 12(b)(5)

"When a defendant moves for dismissal under Rule 12(b)(5), the Court must first address the preliminary questions of service and personal jurisdiction." *Caruso Glynn, LLC*, 2012 WL 4053802, at *3.

Defendant argues that service of the Summons and Complaint was improper because 8 U.S.C. § 1451(b) requires personal service, but the Government resorted to nail-and-mail service without a prior court order authorizing such service. (ECF No. 20 ("D's Mem.") at 1-2, 4-5.) Defendant also argues that the Government failed to satisfy the due diligence requirement set forth in New York Civil Practice Law and Rule ("CPLR") § 308(4) before resorting to nailing-and-mailing. (*Id.* at 5-8.) The Government argues it complied with the requirements for service in denaturalization cases by providing the Defendant with personal notice, (ECF No. 23 ("P's Opp.") at 4-6), and complied with FRCP 4 by acting with due diligence before resorting to nail-and-mail service, (*id.* at 6-7).

Title 8, United States Code, Section 1451 governs the procedure for revocation of naturalization. Section 1451(b) provides:

> The party to whom was granted the naturalization alleged to have been illegally procured or procured by concealment of a material fact or by willful misrepresentation shall, in any such proceedings under subsection (a) of this section, have sixty days' personal notice, unless waived by such party, in which to make answers to the petition of the United States; and if such naturalized person be absent from the United States or from the judicial district in which such person last had his residence, such notice shall be given either by personal service upon him or by publication in the manner provided for the service of summons by publication or upon absentees by the laws of the State or the place where such suit is brought.

8 U.S.C. § 1451(b). Thus, the statute requires only that the defendant receive personal notice; it does not state that the defendant must be personally served, except when the defendant is absent

9

from the judicial district in which he had his last residence (and even then service by publication may suffice).  This requirement of personal service is not applicable here, however, where the Government has shown that Defendant was present in and resides in this District.  Shortly before the Government filed its complaint, it sent Defendant a letter, (*see* ECF No. 25-1), to which Defendant responded via email, (*see* ECF No. 25-2).[3]  Attached to the email was a letter in which Defendant listed the service address – located in Tuckahoe, which is in Westchester County in this District – as his address.  (*See id.*)  The record contains no reason to doubt that Defendant resides at that address or to believe that he was absent from this District when the Government effected service.  Because Defendant was present in this judicial district at the time of service, personal service (or service by publication) was not required.[4]  Defendant was entitled only to personal notice.

According to its common meaning, "personal notice is communication of information, orally or in writing, according to the circumstances, directly to the person affected or to be charged."  *United States v. Tuteur*, 215 F.2d 415, 418 (7th Cir. 1954).  In its legal sense, notice "may be defined as information concerning a fact, actually communicated to a person by an authorized person, or actually derived by him from a proper source," and "is regarded in law as actual when the person sought to be affected by it knows thereby of the existence of the particular fact in question."  *Id.*  Thus, the Seventh Circuit found that the defendant in *Tuteur* had

---

[3] "A court may consider matters outside the pleadings to assess the sufficiency of service on a Rule 12(b)(5) motion."  *Harkins v. Citizens Bank*, 744 F. Supp. 3d 268, 275 (W.D.N.Y. 2024); *see Caruso Glynn, LLC*, 2012 WL 4053802, at *3.

[4] Although Defendant argues that § 1451(b) also requires prior court authorization before the Government may resort to alternative service by publication, (*see* D's Mem. at 4), the statute includes no such requirement, *see* 8 U.S.C. § 1451(b), and in any event service here was not by publication.

10

received personal notice where the defendant had appeared in the action and therefore must have had notice of the pendency of the denaturalization petition. *See id.* at 419 (explaining defendant had notice because "[o]n no other basis can his retention of counsel and the filing of several motions and answers by them on his behalf be explained"). Similarly, here, Defendant appeared in the action by filing the instant motion to dismiss. Thus, Defendant had personal notice of the pendency of the action.

Furthermore, although Defendant argues that the statute requires personal service, "[t]he statute makes no reference to service of the required notice and indeed the method of giving the required notice is not specified by the statute." *Id.*; *see United States v. Cardillo,* 135 F. Supp. 798, 800 (W.D. Pa. 1955) ("Nothing in the applicable statute or the [FRCP] specifies any form of notice or process to be served upon a respondent."). Thus, the relatively few courts to have considered this issue have found various forms of service other than personal service complied with Section 1451(b) so long as the defendant had notice. *See Tuteur*, 215 F.2d at 418-19 (service effected on defendant's wife sufficient under statute); *Cardillo*, 135 F. Supp. at 800 (notice effectuated by registered mail or publication was adequate). I concur that "[i]f, as a matter of fact, personal notice to the respondent results from any method which petitioner uses, the purpose of the statutory provision has been met and no rights of the respondent have been infringed." *Tuteur*, 215 F.2d at 419. Because, as explained, Defendant must have received notice of the pendency of the action to have appeared and submitted a motion to dismiss, the nail-and-mail method of service used by the Government complied with the statute and Defendant's rights have been protected.

Further, to the extent that the FRCP applies to denaturalization proceedings, such that service must have also complied with FRCP 4, the service here complied with that rule. *See*

11

*United States v. Jerome*, 16 F.R.D. 137, 138 (S.D.N.Y. 1954) ("The applicability of the [FRCP]

to denaturalization proceedings is emphasized by subsection (6) of Rule 81 which not only does

not remove denaturalization proceedings from the coverage of the Rules, but specifies only two

exceptions with regard to such proceedings – *i.e.*, in the instances of service by publication and

the time to file an answer.").[5]

> Unless otherwise provided by federal law, Rule 4(e) governs the service of an
> individual within a judicial district of the United States. "An individual may be
> served in a judicial district of the United States by . . . following state law for
> serving a summons in an action brought in courts of general jurisdiction in the
> state where the district court is located or where service is made."

*United States v. Veeraswamy*, 765 F. Supp. 3d 168, 191 (E.D.N.Y. 2025) (quoting Fed. R. Civ.

P. 4(e)(1)). New York permits service by nail and mail where service cannot be effected with

due diligence under other methods. *See id.* at 192.

> Nail-and-mail service of process entails a process servicer "affixing the summons
> to the door of either the actual place of business, dwelling place or usual place of
> abode within the state of the person to be served and by either mailing the

---

[5] The cited provision, which now appears in Rule 81(a)(3), provides,

> *Citizenship*. These [Federal Rules of Civil Procedure] apply to proceedings for
> admission to citizenship to the extent that the practice in those proceedings is not
> specified in federal statutes and has previously conformed to the practice in civil
> actions. The provisions of 8 U.S.C. § 1451 for service by publication and for
> answer apply in proceedings to cancel citizenship certificates.

In *Jerome*, Judge Weinfeld relied on this provision in concluding that the Government was
entitled to depositions in a denaturalization case. *See* 16 F.R.D. at 138. That Rule 81 carves out
only § 1451's service-by-publication provision could be understood to mean any other kind of
service under § 1451 must comply with the Federal Rules, including Rule 4, which governs
service of a summons and complaint – in other words, that service by publication is governed by
§ 1451(b) and otherwise the Federal Rules apply, including Rule 4's provisions for service. But
given that Congress must have understood that other forms of notice, not necessarily amounting
to "service," are allowed under § 1451(b), the best understanding of Rule 81's interplay with
Rule 4 may be that those rules do not address "personal notice" under § 1451(b) at all. In any
event, assuming Rule 4 applies, I find its requirements have been met for the reasons set forth in
the text below.

summons to such person at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business."

*Id.* (quoting N.Y. C.P.L.R. § 308(4)).

Defendant argues the Government did not exercise due diligence before resorting to nail-and-mail service because the process server did not confirm with neighbors or other residents that Defendant lived at that address. (D's Mem. at 3-8.) But "even without speaking to a neighbor or mailman, due diligence can be satisfied when there are quality attempts at delivery that include times in which it is likely that the person to be served would be available." *Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 2d 254, 262 (E.D.N.Y. 2011); *see Westchase Residential Assets II, LLC v. Gupta*, No. 14-CV-1435, 2016 WL 3688437, at *6 (E.D.N.Y. July 7, 2016) ("[I]t is not an absolute requirement of exercising due diligence under CPLR § 308(4) that a process server make general inquiries into the defendant's whereabouts prior to attempting personal service at his or her residen[ce] or place of business."). Indeed, checking with neighbors in this case would have been pointless, as Defendant had already confirmed, via his emailed letter, that the service address was his address. Thus, so long as the Government's process server made quality attempts at service, the failure to confirm the Defendant's residence with neighbors does not show a lack of due diligence.

There is no set rule for what constitutes due diligence. *See Veeraswamy*, 765 F. Supp. 3d at 192; *Allstate Ins. Co.*, 771 F. Supp. 2d at 261; *Sartor v. Utica Taxi Ctr., Inc.*, 260 F. Supp. 2d 670, 676 (S.D.N.Y. 2003). Nevertheless, "case law has shaped a rough standard," including that "[s]ervice should be attempted during times when the defendant could be reasonably expected to be found at their actual place of business, dwelling place, *or* usual place of abode," *Veeraswamy*, 765 F. Supp. 3d at 192 (emphasis in original), and at least three attempts should be made,

13

"optimally on non-consecutive days," *Weifang Xinli Plastic Prods. v. JBM Trading Inc.*, No. 11-CV-2710, 2014 WL 4244258, at *3 (E.D.N.Y. Aug. 26, 2014), *aff'd sub nom. Weifang Xinli Plastic Prods. Co. v. JBM Trading Inc.*, 583 F. App'x 24 (2d Cir. 2014).

The Government's process server made four attempts to serve the Summons and Complaint on Defendant at his home address before resorting to nail-and-mail service. (*See* Aff. of Service.) The attempts were made on December 10, 2024 at 12:58 p.m.; December 12, 2024 at 6:42 p.m.; December 18, 2024 at 7:16 a.m.; and February 12, 2025 at 1:23 p.m. (*Id.*) The attempts were therefore made on non-consecutive days, with two of the four attempts during non-work hours and at a time when Defendant reasonably could be expected to be home. Thus, these attempts satisfy the due diligence requirement. *See S.E.C. v. Reynolds*, No. 96-6073, 1996 WL 599797, at *2 (2d Cir. 1996) (unpublished table opinion) (finding three attempts at service, including two during non-business hours, satisfied due diligence requirement); *Finkel v. Pomalee Elec. Co.*, No. 16-CV-4200, 2018 WL 1320689, at *7 (E.D.N.Y. Feb. 22, 2018) (four attempts to serve defendant at actual place of business constituted due diligence where each attempt took place at different time but when it would be reasonable to assume defendant would be at work and two attempts took place on non-consecutive days), *report and recommendation adopted*, 2018 WL 1318997 (E.D.N.Y. Mar. 14, 2018); *Allstate Ins. Co.*, 771 F. Supp. 2d at 262 (finding due diligence where attempts to serve included weekday evening, Saturday morning, early morning, and afternoon of a weekday).

Defendant argues that on his second attempt, the process server improperly looked at a package at the residence, which he suggests demonstrates the Government's disregard for proper process. (D's Mem. at 6-9.) But checking to whom mail is addressed at the service address is actually evidence that the process server exercised due diligence. *See S.E.C.*, 1996 WL 599797,

14

at *2 (process server's observation of mail addressed to defendant justified attempt to effect personal service at that location and supported conclusion that due diligence had been exercised); *Veeraswamy*, 765 F. Supp. 3d at 193 (finding due diligence and noting process server's efforts to verify that defendant resided at address of service included observing packages addressed to the defendant). By looking to see to whom the package was addressed here, the process server learned that the package was addressed to Defendant's daughter, which provided more evidence that the Defendant in fact lived at that address. (ECF No. 24 ¶ 9.) Thus, this inquiry supports the conclusion that the Government exercised due diligence before resorting to nail-and-mail service.

Defendant also contends that dismissal is warranted because the process server's affidavit is false, arguing that evidence from Defendant's doorbell camera shows that two different individuals attempted to serve Defendant at the service address, whereas the affidavit states that the same process server made all four attempts. (D's Mem. at 3, 8-9.) Defendant's Exhibits B and C are images from Defendant's doorbell camera that show different individuals at Defendant's residence. (*Compare* D's Mem. Ex. B, *with* D's Mem. Ex. C.) The Government's process server, Adrian DeCarlo, has submitted an affidavit explaining that he is the individual shown in Exhibit B, but that he does not know the identity of the individual shown in Exhibit C. (ECF No. 24 ¶ 8.) Mr. DeCarlo also states that he was the one who attempted to serve Defendant on all four occasions, and that no one else made any of the attempts described in his affidavit of service. (*Id.* ¶¶ 5-6.) Defendant has not provided the Court any reason to doubt either of Mr. DeCarlo's sworn affidavits. Although both parties agree that the individual in Exhibit C is not Mr. DeCarlo, this does not mean that Mr. DeCarlo did not make all four service attempts. The screenshot in Exhibit C is timestamped 9:10 a.m. on December 18, 2024. (*See* D's Mem. Ex. C;

15

D's Mem. at 3.)  But Mr. DeCarlo's affidavit states that he attempted to effect service on December 18, 2024 at 7:16 a.m.  (*See* Aff. of Service.)  Thus, that a different individual rang the bell at Defendant's residence two hours after Mr. DeCarlo attempted to effect service does not mean that Mr. DeCarlo did not make all four service attempts or lied in his affidavit.

Plaintiff has carried its burden to show proper service, and accordingly Defendant's motion to dismiss under Rule 12(b)(5) is denied.

### B.    Plaintiff's Motion for Summary Judgment

The Government moves for summary judgment, seeking to set aside the order admitting Defendant to U.S. citizenship and to cancel his Certificate of Naturalization pursuant to 8 U.S.C. § 1451(a).  (*See* ECF No. 13 ("P's Mem.") at 1.)  "A civil action seeking denaturalization is the proper means for revoking the citizenship of a naturalized citizen."  *United States v. Rivera*, No. 10-CV-133, 2011 WL 1343153, at *3 (S.D. Ohio Mar. 2, 2011), *report and recommendation adopted*, 2011 WL 1343154 (S.D. Ohio Apr. 8, 2011).  "Congress has authorized the Government to seek civil denaturalization in two limited situations:  (1) the naturalized citizen illegally procured naturalization; or (2) the naturalized citizen procured naturalization by concealment of material facts or by willful misrepresentation."  *United States v. Campos*, No. 16-CV-20777, 2016 WL 8678885, at *2 (S.D. Fla. Nov. 3, 2016) (citing 8 U.S.C. § 1451(a)).  But because "[c]itizenship is a cherished right that once conferred should not be taken away without the clearest justification and proof," *id.*, "the government carries a heavy burden of proof in a denaturalization proceeding," *United States v. Donkor*, 507 F. Supp. 3d 423, 429 (E.D.N.Y. 2020); *see United States v. Gayle*, 996 F. Supp. 2d 42, 48 (D. Conn. 2014).  "To prevail, the Government must prove its case by clear, unequivocal, and convincing evidence which does not leave the issue in doubt," and "the facts and the law should be construed as far as is reasonably

16

possible in favor of the citizen." *Campos*, 2016 WL 8678885, at *2; *see Valerio v. U.S. Immigr. & Naturalization Serv.*, 86 F. Supp. 2d 1009, 1012 (D. Haw. 1999) ("The United States must prove the alleged illegal procurement by clear and convincing evidence."). Nevertheless, "even in denaturalization cases, the facts of a case may be such that revocation of citizenship at the summary judgment stage is appropriate." *Gayle*, 996 F. Supp. 2d at 48.

The Government argues both that Defendant illegally procured his naturalization and that he procured it by concealment of a material fact or by willful misrepresentation. (P's Mem. at 2.) Defendant did not oppose the Government's motion, except through his motion to dismiss.[6]

### 1. Illegally Procured

First, the Government argues Defendant procured his citizenship and Certificate of Naturalization illegally. (P's Mem. at 9-18.)

> In order to be eligible for naturalization, a person must satisfy three criteria: (1) have been lawfully admitted to the United States for permanent residence; (2) be a person of good moral character for at least five years before filing a naturalization application; and (3) have resided continuously and have been physically present in the United States for the required statutory period.

*Gayle*, 996 F. Supp. 2d at 49. "[T]here must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship. Failure to comply with any of these conditions renders the certificate of citizenship 'illegally procured,' and naturalization that is unlawfully procured can be set aside." *Fedorenko v. United States*, 449 U.S. 490, 506 (1981) (quoting 8 U.S.C. § 1451(a)); *see Gayle*, 996 F. Supp. 2d at 49.

The Government contends that Defendant did not meet the second statutory requirement: that he be a person of good moral character for five years before filing his naturalization

---

[6] The Government served Defendant with the notice required by LR 56.2. (ECF No. 17.) Thus, he was on notice that failure to file a proper opposition might result in judgment in favor of Plaintiff. *See Murray*, 2024 WL 1421119, at *4.

application.  (P's Mem. at 9-18.)  "The statutory period for good moral character begins five years prior to the filing of the N-400 through the date the applicant takes the oath of allegiance and becomes a citizen."  *Gayle*, 996 F. Supp. 2d at 49.  Defendant filed his N-400 on May 4, 2001, and was naturalized on July 24, 2002.  (*See* N-400 Application at 2 (stamp indicating application was received on May 4, 2001) [7]; ECF No. 1-9 (Certificate of Naturalization dated July 24, 2002).)  Thus, to comply with the statute, he must have been a person of good moral character from May 4, 1996 through July 24, 2002.

An applicant for naturalization cannot establish good moral character if, during the statutory period, he:  (1) commits a crime involving moral turpitude (a "CIMT"), (2) commits offenses resulting in two or more convictions for which the aggregate sentence is at least five years' incarceration, (3) commits unlawful acts that reflect adversely on his moral character, or (4) gives false testimony to obtain an immigration benefit.  *See* 8 C.F.R. §§ 316.10(b)(2)-(3). The Government argues that Defendant did all four.

a.      Crimes Involving Moral Turpitude

The Government argues the crimes charged in the 2005 Indictment are CIMTs.  (P's Mem. at 10-13.)  I agree as to obstruction of justice, and do not reach the other convictions.

CIMTs require "two essential elements:  reprehensible conduct and a culpable mental state." *Mota v. Barr*, 971 F.3d 96, 98 (2d Cir. 2020).  "A crime involves reprehensible conduct if that conduct is inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." *Id.*; *see Gill v. Immigr. & Naturalization Serv.*, 420 F.3d 82, 89 (2d Cir. 2005) ("Moral turpitude is a term used to refer to

---

[7] Citations to the N-400 Application refer to the page numbers generated by the Court's Electronic Case Filing ("ECF") system.

offenses that are inherently base, vile, or depraved."). "As to a culpable mental state, crimes committed knowingly or intentionally generally have been found, on the categorical approach, to be CIMTs." *Mota*, 971 F.3d at 99; *see also Mendez v. Mukasey*, 547 F.3d 345, 347 (2d Cir. 2008) ("[G]enerally, where intent is not an element of a crime, that crime is not one involving moral turpitude.").

"In determining whether a crime is a crime involving moral turpitude, [courts in the Second Circuit] apply either a categorical or a modified categorical approach. Under the categorical approach, [a court] look[s] only to the minimum criminal conduct necessary to satisfy the essential elements of the crime, not the particular circumstances of the defendant's conduct." *Mendez*, 547 F.3d at 348. But if a statute is divisible, a court should use the modified categorical approach. *See id.* A statute is divisible if it "sets out multiple, alternative elements of a crime, effectively creating several different crimes." *Gomez-Ruotolo v. Garland*, 96 F.4th 670, 678 (4th Cir. 2024). Under the modified categorical approach, a court "may refer to the record of conviction to determine whether a petitioner's conviction was under the branch of the statute that proscribes removable offenses." *Mendez*, 547 F.3d at 348. "The record of conviction includes, *inter alia*, the charging document, a plea agreement, a verdict or judgment of conviction, a record of the sentence, or a plea colloquy transcript." *Gayle*, 996 F. Supp. 2d at 50.

Title 18, United States Code, Section 1512 is a divisible statute because it comprises multiple, alternative versions of the crime. *See Harris v. United States*, No. 12-CR-232, 2019 U.S. Dist. LEXIS 130155, at *5-6 (D.S.C. Aug. 2, 2019) (witness tampering statute 18 U.S.C. § 1512 is divisible because it presents several ways in which a defendant can tamper with witness testimony and provides alternate punishments for different types of tampering), *appeal dismissed sub nom. United States v. Harris*, 801 F. App'x 126 (4th Cir. 2020) (*per curiam*); *see*

19

*also Baker v. United States*, No. 97-CR-877, 2025 U.S. Dist. LEXIS 179304, at *7 (E.D.N.Y. Sept. 12, 2025) (noting previous judge found § 1512(b) was a divisible statute).  Applying the modified categorical approach, the Government's evidence makes clear that Defendant was convicted under § 1512(b)(2)(B) and § 2.  (*See* 2005 Indictment at 8-9).

Section 1512(b)(2)(B) makes it a crime to "knowingly use[] intimidation, threaten[], or corruptly persuade[] another person . . . with intent to . . . cause or induce any person to . . . alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding."  Because the statute requires that the defendant acted knowingly and with intent, the *mens rea* element of a CIMT is satisfied for that conviction.  *Cf. Mendez v. Barr*, 960 F.3d 80, 84-85 (2d Cir. 2020) (obstruction of justice under 18 U.S.C. § 1510 contains intent requirement and is a CIMT).  The offense also involved reprehensible conduct.  Although the Second Circuit has not specifically found that obstruction of justice under 18 U.S.C. § 1512(b)(2)(B) involves reprehensible conduct, the Circuit has found that obstruction of justice under 18 U.S.C. § 1510 is a CIMT.  *See Mendez*, 960 F.3d at 84-85.  That statute provides that a person commits obstruction of justice where he or she willfully endeavors to obstruct, delay, or prevent the communication of information relating to the violation of any criminal statute to a criminal investigator.  *See id.* (citing 18 U.S.C. § 1510).  Section 1512(b)(2)(B) similarly proscribes intentionally endeavoring to make evidence unavailable for an official proceeding, defined as a proceeding before a court, grand jury, Congress, federal agency or insurance regulator.  *See* 18 U.S.C. § 1515(a)(1) (defining "official proceeding" as used in § 1512).  While "official proceedings" are broader than criminal investigations, they encompass formal inquiries of importance to the government.  The conduct proscribed by § 1512(b)(2)(B) is therefore similar to that proscribed by § 1510, which the Second Circuit has

stated is a CIMT.  *See Mendez*, 960 F.3d at 84-85; *see also Rodriguez v. Gonzales*, 451 F.3d 60, 64 (2d Cir. 2006) (*per curiam*) (crimes involving affirmative act calculated to deceive and intent to impair efficiency and lawful functioning of the government are CIMTs).  Likewise, the Eleventh Circuit has found that Section 1512(b)(1), which makes it a crime to knowingly use intimidation, threaten, corruptly persuade or mislead with intent to influence, delay, or prevent testimony in an official proceeding, is a CIMT.  *See Banjoko v. U.S. Att'y Gen.*, 443 F. App'x 486, 488 (11th Cir. 2011) (*per curiam*).  Doing the same with intent to hide evidence rather than prevent testimony is equally reprehensible.  Thus, I find the obstruction of justice of which Defendant was convicted also involves reprehensible conduct and is a CIMT.

As that conduct occurred in July 2001, (2005 Indictment at 8), Defendant's conviction shows that he did not possess good moral character during the statutory period of May 1996 to July 2002.

> b.    Offenses Resulting in Two or More Convictions with Sentence of Five Years' Incarceration

Even if Defendant had not committed a CIMT, there is no genuine dispute that Defendant did not possess good moral character during the statutory period because he was convicted of offenses resulting in two or more convictions for which the aggregate sentence was at least five years' incarceration.  Defendant was convicted of three offenses charged in the 2005 Indictment: conspiracy to commit Hobbs Act extortion and attempted Hobbs Act extortion in violation of 18 U.S.C. § 1951(b), and obstruction of justice in violation of 18 U.S.C. § 1512(b)(2).  (*See* 2005 Indictment; ECF No. 1-7.)  Defendant received a sentence of 210 months, or seventeen years and six months.  (*See* ECF No. 1-7.)

Although Defendant was convicted on June 14, 2006, which was after he was naturalized, Defendant committed the acts underlying these convictions during the statutory period.  (*See*

21

ECF No. 1-6 at 2 (noting date of imposition of judgment as June 14, 2006 and that offenses ended in 2001); ECF No. 1-7 at 1 (same); 2005 Indictment (offenses alleged to have occurred in 2001).) *See Gayle*, 996 F. Supp. 2d at 51-52 (fact that defendant committed acts that constituted basis for conviction before naturalization but was not convicted until after obtaining citizenship does not preclude denaturalization). Further, the convictions do not need to arise from separate trials or involve separate schemes of misconduct to bar a finding of good moral character on this ground. *See* 8 U.S.C. § 1182(a)(2)(B) (applying to any alien convicted of two or more offenses, whether or not arising from single scheme of misconduct, for which aggregate sentences were five years or more); *United States v. Flores*, No. 22-CV-395, 2024 WL 245534, at *5 (N.D. Okla. Jan. 23, 2024) (defendant "[fell] squarely within scope of 8 U.S.C. § 1182(a)(2)(B)" where he pleaded guilty to four counts of child sexual abuse charged in one indictment and was sentenced to twenty-five year term of imprisonment). Thus, there is no genuine dispute that Defendant was convicted of offenses resulting in two or more convictions for which the aggregate sentence was at least five years' incarceration. Accordingly, the 2006 convictions also demonstrate that Defendant did not possess good moral character during the statutory period.[8]

### c.    Unlawful Acts

The Government also argues that Defendant's commission of unlawful acts during the statutory period means he did not possess good moral character. (P's Mem. at 15-16.)

"Unless [an] applicant establishes extenuating circumstances, the applicant shall be found to lack good moral character if, during the statutory period, the applicant . . . [c]ommitted

---

[8] Defendant was also convicted of the offenses alleged in the 2001 Indictment and was sentenced to fifteen months' imprisonment. (*See* ECF No. 1-4.) Thus, these are additional offenses for which, when considered with his 2006 convictions, he received an aggregate sentence greater than five years' incarceration.

unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts . . . ."  8 C.F.R. § 316.10(b)(3); *see United States v. Dang*, 488 F.3d 1135, 1139-41 (9th Cir. 2007) (commission of unlawful acts during statutory period is valid basis for denaturalization).  "Courts define the term 'unlawful acts' . . . to mean bad acts that would rise to the level of criminality, regardless of whether a criminal prosecution was actually initiated."  *Bawanah v. Reffel*, No. 14-CV-31, 2015 WL 10059418, at *3 (W.D. Va. Nov. 10, 2015), *report and recommendation adopted*, 2016 WL 613007 (W.D. Va. Feb. 11, 2016), *order entered*, 2016 WL 614748 (W.D. Va. Feb. 11, 2016).

It is undisputed that Defendant committed six unlawful acts during the statutory period: the crimes alleged in the 2001 Indictment of which Defendant was convicted – conspiracy to transport a stolen vehicle and to commit mail fraud; conspiracy to transport, receive, possess, sell, distribute, and purchase stolen contraband cigarettes; and conspiracy to deal in counterfeit U.S. currency – and the crimes alleged in the 2005 Indictment of which Defendant was convicted – conspiracy to commit extortion, attempted extortion, and obstruction of justice.  (*See* ECF Nos. 1-4 (judgment noting offenses ended in 1999 and 2000), 1-7 (judgment noting offenses ended in 2001).)  These acts adversely reflect on Defendant's moral character, *cf. United States v. Salem*, 496 F. Supp. 3d 1167, 1177 (N.D. Ill. 2020) (unlawful acts including mail fraud reflected poorly on moral character); *Bawanah*, 2015 WL 10059418, at *4 (conviction for unlawfully trafficking counterfeit cigarettes adversely reflected on defendant's moral character); *United States v. Lekarczyk*, 354 F. Supp. 2d 883, 885 (W.D. Wisc. 2005) (crimes of bank fraud, bail jumping and forgery-uttering constituted unlawful acts that barred finding that defendant was person of good moral character), and Defendant was convicted and imprisoned for all such acts.  Thus, these

unlawful acts provide yet another basis for finding as a matter of law that Defendant lacked the good moral character required to naturalize at the time of his naturalization.

Although the regulations permit a court to consider extenuating circumstances, Defendant, in failing to respond to the substance of the Government's motion for summary judgment, has failed to raise a genuine issue of material fact as to whether extenuating circumstances existed here.  *See Salem*, 496 F. Supp. 3d at 1177-78 (defendant failed to show extenuating circumstances where he failed to respond to government's motion for summary judgment and thus any uncontroverted statements were admitted as true).

### d.     False Testimony

Finally, the Government argues that Defendant cannot establish good moral character because he gave false testimony on his application for naturalization and at his naturalization interview.  (P's Mem. at 16-18.)

An applicant is barred from showing he is a person of good moral character if he gave false testimony during the statutory period for the purpose of obtaining an immigration benefit. *See* 8 U.S.C. § 1101(f)(6).  The false testimony does not need to be material, but it must be an oral statement made under oath and the applicant must have the subjective intent to deceive.  *See Kungys v. United States*, 485 U.S. 759, 779-82 (1988).

Here, by the time of his naturalization interview on May 2, 2002, (*see* ECF No. 15 ("Scott Decl.") ¶ 7; *see also* N-400 Application at 5 (interviewer dated application May 2, 2002)), Defendant had been indicted and arrested for the offenses charged in the 2001 Indictment, *see United States v. Pizzuti*, No. 01-CR-1122 (S.D.N.Y.), Dkt. Entries dated Dec. 5, 2001 (noting Defendant was arraigned, entered a plea of not guilty, and was released on a $350,000 bond on that date); *id.* at ECF No. 1 (indictment filed December 3, 2001).  Officer

Robert Scott, the immigration officer who interviewed Defendant, affirmed under oath that it was his standard practice to discuss all of the questions on the N-400 during an interview, and that he did in fact discuss with Defendant whether Defendant had ever been arrested or indicted for violating the law.  (*See* Scott Decl. ¶¶ 11, 16, 18-19.)  Despite being arrested and arraigned just five months before, when asked this question in the interview, Defendant responded "no."  (*Id.* ¶¶ 16, 18-19; N-400 Application at 4.)  Similarly, Defendant engaged in additional criminal conduct from May 2001 to September 2001.  (*See generally* 2005 Indictment.)  Even though Defendant was not indicted for this conduct until March 9, 2005, (*see* 2005 Indictment), and was not convicted of it until July 12, 2005, (ECF No. 1-6), by the time of his naturalization interview in May 2002, he had engaged in criminal conduct for which he had not yet been arrested.  Nevertheless, when asked at his interview whether he had ever knowingly committed any crime for which he had not been arrested, Defendant responded, "no."  (Scott Decl. ¶¶ 14, 18-19; N-400 Application at 4.)  Defendant was under oath when he gave these responses, as he had been placed under oath at the beginning of the interview.  (*See* Scott Decl. ¶ 10.)

"False testimony or statements made under oath during the interview portion of the naturalization process constitute false testimony within the meaning of section 1101(f)(6)." *United States v. Regalado*, No. 25-CV-1519, 2026 WL 371317, at *3 (E.D.N.C. Jan. 27, 2026) (collecting cases); *see United States v. Nunez-Garcia*, 262 F. Supp. 2d 1073, 1083 (C.D. Cal. 2003) ("[A]n applicant's false oral statement made under oath in a question and answer examination before an INS officer during any stage of the process for naturalization constitutes false testimony within the meaning of 8 U.S.C. § 1101(f)(6).").  Thus, Defendant gave false testimony within the meaning of 8 U.S.C. § 1101(f)(6) for the purpose of obtaining an immigration benefit, and thus lacked good moral character.

25

Accordingly, based on the foregoing, there is no genuine dispute that Defendant lacked good moral character during the statutory period, and thus he did not comply with all of the statutory requirements for naturalization. Thus, the Government has shown by clear, unequivocal and convincing evidence that Defendant procured his U.S. citizenship and Certificate of Naturalization illegally.

### 2. Procured by Concealment of Material Fact or Willful Misrepresentation

Second, the Government argues Defendant procured his citizenship by concealment of material fact and/or willful misrepresentation. (P's Mem. at 18-22.)

> To prove that a person procured naturalization by concealment of a material fact or by willful misrepresentation, the Government must establish the following elements: [1] the naturalized citizen must have misrepresented or concealed some fact, [2] the misrepresentation or concealment must have been willful, [3] the fact must have been material, and [4] the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment.

*United States v. Mahmood*, No. 17-CV-1562, 2020 WL 532062, at *2 (D. Conn. Feb. 3, 2020).

Defendant does not, and indeed, cannot challenge the Government's contention that he willfully misrepresented facts about prior criminal activity and arrests when he submitted his N-400 and in his interview with the immigration officer. First, the evidence shows that between July 1998 and August 2000, Defendant engaged in criminal conduct. (*See generally* 2001 Indictment.) Thus, even though he was not arrested for this conduct until December 5, 2001, *see United States v. Pizzuti*, No. 01-CR-1122 (S.D.N.Y.), Dkt. Entries dated Dec. 5, 2001 (noting Defendant was arraigned, entered a plea of not guilty, and was released on a $350,000 bond on that date), which was after he submitted his N-400 on May 4, 2001, the acts which comprised the offenses occurred before he submitted his application, (*see* 2001 Indictment at 1-3, 5-7, 9-10 (listing dates of criminal conduct between July 1998 and August 2000)). "Accordingly, his negative response to Part 7, Question 15a of his N-400, which asked 'have you ever knowingly

26

committed a crime for which you have not been arrested,' was a perjurious misrepresentation and concealment of the criminal acts then occurring." *Gayle*, 996 F. Supp. 2d at 54. (*See* N-400 Application at 4 (marking "no" in response to part 7, question 15a).)

Additionally, as explained, by the time of his naturalization interview on May 2, 2002, Defendant had been indicted and arrested for this conduct. *See United States v. Pizzuti*, No. 01-CR-1122 (S.D.N.Y.), Dkt. Entries dated Dec. 5, 2001; *id.* at ECF No. 1. Officer Scott asked Defendant whether he had ever been arrested or indicted for breaking or violating the law, (*see* Scott Decl. ¶¶ 11, 16, 18-19) and, despite being arrested and arraigned just five months before, Defendant responded "no." (*Id.* ¶¶ 16, 18-19; N-400 Application at 4.)

Similarly, as discussed, Defendant engaged in additional criminal conduct from May 2001 to September 2001. (*See generally* 2005 Indictment.) Even though Defendant was not indicted until March 9, 2005, (*see* 2005 Indictment), and was not convicted until July 12, 2005, (ECF No. 1-6), by the time of his naturalization interview in May 2002, Defendant had engaged in criminal conduct for which he had not yet been arrested. Nevertheless, when asked at his interview whether he had ever knowingly committed any crime for which he had not been arrested, Defendant responded, "no." (Scott Decl. ¶¶ 14-15, 18-19; N-400 Application at 4.) Defendant again misrepresented these facts when he signed his N-400 at the conclusion of the naturalization interview and certified under penalty of perjury that he knew the contents of the application and that his responses were true and correct. (Scott Decl. ¶ 20; N-400 Application at 5.)

"The Second Circuit has held in nearly identical cases that this evidence is sufficient for the government to prove misrepresentation or concealment." *Gayle*, 996 F. Supp. 2d at 54; *see United States v. Oddo*, 314 F.2d 115, 117 (2d Cir. 1963) (government's evidence that defendant

checked "no" to questions asking whether he had prior arrests during statutory period and testified to same in interview, even though he had previously been arrested, along with testimony that it was standard procedure during interview to require applicants to affirm accuracy of answers, constituted sufficient evidence of misrepresentation and concealment); *United States v. Rossi*, 319 F.2d 701, 702-04 (2d Cir. 1963) (same). Thus, the Government has met its burden here to show that Defendant misrepresented and concealed his prior criminal conduct and arrests.

Second, the Government must show that these misrepresentations were willful. The Government has made that showing here. "An act is done willfully if it is done intentionally and deliberately and if it is not the result of innocent mistake, negligence or inadvertence." *Emokah v. Mukasey*, 523 F.3d 110, 116-17 (2d Cir. 2008). "[T]he government is not required to submit proof of the alien's intent to deceive, rather knowledge of the falsity of the misrepresentation will suffice." *United States v. Okeke*, 671 F. Supp. 2d 744, 752 (D. Md. 2009). "[A]pplicants are assumed to understand the questions being asked of them on naturalization forms and reply accordingly." *Gayle*, 996 F. Supp. 2d at 55. Here, there is no evidence suggesting that Defendant did not understand the questions asked on the form or in the interview. Additionally, "[w]hether a misstatement is innocent or willful may depend on the significance of the underlying circumstance, that is whether it is a minor detail or an important fact." *Id.* By the time of his interview, Defendant had been arrested and arraigned on the charges in the 2001 Indictment. This is hardly a minor detail that one would forget just five months after it happened, especially because Defendant had pledged his home as security for a $350,000 bond for his release from custody. (*See* ECF No. 1-1 ¶ 46.) *United States v. Pizzuti*, No. 01-CR-1122 (S.D.N.Y.), Dkt. Entry dated Dec. 5, 2001 (noting bond secured by defendant's home valued at $300,000); *see also Okeke*, 671 F. Supp. 2d at 752 (government met burden to show concealment

28

of prior arrest was willful where defendant was fingerprinted, held in custody for a night, and released by way of bond payment made by friends, and thus must have been aware he had been arrested). Finally, Defendant signed his application under penalty of perjury and repeated his false answers under oath. This too demonstrates that the misrepresentation was willful. *See United States v. Hirani*, 824 F.3d 741, 749 (8th Cir. 2016); *United States v. Seaman*, No. 12-CV-572, 2013 U.S. Dist. LEXIS 111883, at \*14-15 (D. Ariz. July 9, 2013); *cf. Singh v. Gantner*, No. 07-CV-772, 2008 WL 3152959, at \*3 (S.D.N.Y. Aug. 5, 2008) (evidence that individual was arrested and repeatedly stated he had never been arrested in interview was sufficient to support agency's finding that misrepresentations were willful).

Third, the Government must prove that these willful misrepresentations were material. *See Fedorenko*, 449 U.S. at 507-08. "[A] misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for [naturalization]." *Id.* at 509; *see Emokah*, 523 F.3d at 117. The Supreme Court has already found that one's arrest record may be a material fact within the meaning of the denaturalization statute. *See Chaunt v. United States*, 364 U.S. 350, 354 (1960); *Fedorenko*, 449 U.S. at 507-08 (summarizing *Chaunt*); *see also Oddo*, 314 F.2d at 118 (finding prior arrest record to be material, explaining that "[f]ailure to disclose a record of prior arrests, even [if] none of those arrests by itself would be a sufficient ground for denial of naturalization, closes to the Government an avenue of enquiry which might conceivably lead to collateral information of greater relevance"). And the Government has presented evidence (that the Defendant does not dispute) that INS would not have approved Defendant's N-400 had he disclosed that he had committed a crime for which he had not yet been arrested or that he had been arrested, cited, charged, indicted, convicted, fined or imprisoned for breaking or violating the law. (*See* Scott Decl. ¶ 21.) Indeed, INS could not

29

have approved Defendant's N-400 had he disclosed those facts, because, as the Government explains, those crimes would have rendered Defendant ineligible for naturalization.  (*Id.* ¶¶ 22-23.)  In other words, Defendant's misrepresentations and concealment about his criminal activities and arrest caused his application to be approved, and thus, "[t]here is no doubt that the Defendant's misrepresentations and concealments were material."  *Gayle*, 996 F. Supp. 2d at 55-56 (misrepresentations about criminal activities material where immigration officer who conducted interview affirmed that application would have been denied had defendant answered truthfully); *see Monter v. Gonzales*, 430 F.3d 546, 558 (2d Cir. 2005) (fact that was clearly linked to statutory ground for removability would have led to further investigation had it been revealed, and thus omission likely affected decision to grant petition).

Finally, the Government must show Defendant procured his citizenship as a result of the misrepresentations or concealment.  But

> once the government establishes "materiality," a presumption arises against – and the burden of persuasion shifts to – the subject of the denaturalization proceeding regarding whether he or she is statutorily "disqualified."  That person may refute the presumption by establishing that he or she did in fact meet the statutory qualification that the misrepresentation had a tendency to influence.

*Monter*, 430 F.3d at 554-55.  "Defendant has not responded to the government's motion [for summary judgment], and, therefore, he has not carried his burden of persuasion that . . . he would have been granted citizenship if he had answered the questions honestly."  *Gayle*, 996 F. Supp. 2d at 56.

Accordingly, the Government has shown by clear, unequivocal and convincing evidence that Defendant procured his U.S. citizenship and Certificate of Naturalization by concealment of material facts and by willful misrepresentations.  Thus, revocation of his citizenship is warranted on that ground as well.

IV.    **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is DENIED, and Plaintiff's motion for summary judgment is GRANTED.  The Court ORDERS that:  (1) the order admitting Defendant to U.S. citizenship is revoked; (2) Defendant's Certificate of Naturalization No. 26724011 is canceled; (3) Defendant is enjoined from claiming any rights, privileges, benefits or advantages of U.S. citizenship based on his July 24, 2002 naturalization; (4) Defendant is further ordered to surrender and deliver his Certificate of Naturalization and any copies thereof in his possession, and any other indicia of United States citizenship and any copies thereof in his possession, to the Attorney General through Plaintiff's counsel within ten days of entry of judgment; (5) Defendant is ordered to make good faith efforts to recover and surrender any such documents that he knows are in the possession of others within the same time frame; and (6) Defendant shall personally appear before the Court on April 22, 2026 at 2:30 p.m. in Courtroom 621 for a compliance hearing at which he must demonstrate his compliance with this Order and the corresponding Judgment, unless Plaintiff advises the Court that Defendant has fully complied, in which case the hearing will be canceled.

The Clerk of Court is respectfully directed to terminate the pending motions, (ECF Nos. 12, 19).

**SO ORDERED.**

Dated:  April 8, 2026
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

31